**FILED**

NOV 1 3 2002



# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

LAURA GONZÁLEZ-VERA,
Calle Galera num. 37
Madrid 28022, SPAIN

JINNY ARANCIBIA,
Los Talavera 85, Depto. B
Ñuñoa, Santiago, CHILE

ÁLVARO MUÑOZ MARÍN,
c/o PCCH
Vicuña Mackenna, 31
Santiago, CHILE

CARLOS REIMUNDO VALERO VARGAS
Los Chaveles # 480
PoH.Zaror Cerrillos, CHILE

JOSEFINA LLIDÓ MENGUAL,
Calle Blasco Ibáñez nº 77, puerta Nº 13
4602121 Valencia, ESPAÑA

RENE EMILIO ASTUDILLO ROJAS,
Pasaje La Pampa No. 906
Población Lo Herrera
Isla de Maipo, CHILE

ERIKA HENNINGS CEPEDA,
Holanda 2931, Dpto. 22
Ñuñoa; Santiago, CHILE

GERMÁN BERGER HERTZ,
Simón Bolivar 5870;
D. La Reina, Santiago, CHILE

RAÚL LORCA TOBAR,
Seminario 343 – "Tower B"
Departamento #110
Providencia, CHILE

GLADYS MARÍN MILLIE,
c/o PCCH
Vicuña Mackenna, 31
Santiago, CHILE

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NUMBER   1:02CV02240

Civil Actio    JUDGE: Henry H. Kennedy

DECK TYPE: General Civil

DATE STAMP: 11/13/20

JURY ACTION

FORCED DISAPPEARANCE;
TORTURE;
CRUEL, INHUMAN OR DEGRADING
TREATMENT;
CRIMES AGAINST HUMANITY;
SUMMARY EXECUTION;
VIOLENCE AGAINST WOMEN;
ARBITRARY DETENTION;
FALSE IMPRISONMENT;
WRONGFUL DEATH;
ASSAULT AND BATTERY;
INTENTIONAL INFLICTION OF
EMOTIONAL DISTRESS.

JURY TRIAL DEMANDED

1

ISOLINA LUCIA RAMÍREZ RAMÍREZ )
Estrella Solitaria 4245 )
Ñuñoa, Santiago; CHILE )
)
CAROL MITCHELL )
as personal representative of the estates of )
CARMELO SORIA, deceased; and )
FREDDY TABERNA, deceased )
c/o Tigar Law Firm )
1025 Connecticut Avenue, NW )
Suite 1012 )
Washington, DC  20036 )
)
)
Plaintiffs, )
                    v. )
)
HENRY ALFRED KISSINGER )
in his individual capacity and as National )
Security Advisor and Secretary of State )
350 Park Avenue )
New York, NY  10022, )
)
MICHAEL VERNON TOWNLEY )
Witness Protection Program )
c/o U.S. Marshal: Donald W. Horton )
U.S. Courthouse )
3rd & Constitution Avenue, NW )
Room 1103 )
Washington, DC 20001 )
)
UNITED STATES OF AMERICA )
United States Attorney General )
John Ashcroft )
950 Pennsylvania Avenue, NW )
Washington, DC  20530, )
)
United States Attorney for )
the District of Columbia )
Roscoe C. Howard, Jr. )
555 Fourth Street, NW )
Washington, DC  20001, )
)
                    Defendants. )

## NATURE OF THE ACTION

1.      This action seeks relief for the harms suffered by Chilean victims and their families following the coup that brought General Augusto Pinochet Ugarte to power in Chile on September 11, 1973.  The Defendants knowingly provided practical assistance and encouragement to the Chilean repressive regime with reckless disregard for the lives and well-being of the Plaintiffs and their families.  Such assistance and encouragement had a substantial effect on the perpetration of the violations alleged in this complaint.

2.      Recently declassified U.S. government documents and Congressional reports have provided Plaintiffs with the information necessary to bring this action.  The documents show that with the practical assistance and encouragement of the United States and the official and *ultra vires* acts of Henry Kissinger, the Chilean terror apparatus conducted systematic torture; cruel, inhuman or degrading treatment; false imprisonment; arbitrary detention; wrongful death; summary execution; assault and battery; forced disappearance; crimes against humanity; violence against women, intentional infliction of emotional distress; and other violations of domestic and international law of which Plaintiffs and their relatives are victims.  The documents illustrate how the United States and/or Henry Kissinger funded, assisted, supported, trained, encouraged, condoned, benefited from, aided and abetted, acted recklessly, acted jointly and conspired with known human rights violators who systematically violated Plaintiffs' and victims' human rights.

3.      Liability rests on, *inter alia*, well-established federal common law tort principles of third-party liability as well as international law principles of aiding and abetting and accomplice liability.

4.      The purpose of this action is to seek relief for the abuses inflicted upon Plaintiffs and their relatives.  Defendants actively, knowingly, and recklessly assisted and supported the commission of these abuses.

5.      This action does not address or seek to interfere with matters of foreign policy, national security, or defense policy decisions of the United States.  This case does not present questions of a political nature; rather, the questions presented are appropriate for judicial determination.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction under 28 U.S.C. §§ 1331, 1350, and 1367.

7.      Supplemental jurisdiction under 28 U.S.C. § 1367 exists as to those claims that are so related to the federal claims that they form part of the same case or controversy.

8.      28 U.S.C. § 1350 provides federal jurisdiction for any "civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  The Defendants in this action committed torts in violation of the following treaties of the United States:

      a)      International Covenant on Civil and Political Rights, adopted Dec. 19, 1966, S. Exec. Doc. E, 95-2 (1978), 999 U.N.T.S. 171, reprinted in 6 I.L.M. 368 (entered into force, Mar. 23, 1976) (ratified by the United States, June 8, 1992);

      b)      Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 39/46, 39 U.N. GAOR, Supp. No. 51, at 197, U.N. Doc A/39/51 (Dec. 10, 1984) (entered into force June 26, 1987) (ratified by the United States Oct. 21, 1994):

9.      Defendants committed torts in violation of the law of nations, as codified in the following international treaties, declarations, laws, and resolutions, including, but not limited to:

a)   Charter of the United Nations, June 26, 1945, 59 Stat. 1031, TS 993;

b)   Universal Declaration of Human Rights, G.A. Res. 217(III), U.N. Doc. A/810 at
     71 (1948);

c)   Charter of the Organization of American States, 2 U.S.T. 2394, 119 U.N.T.S. 3,
     as amended, Protocol of Buenos Aires of 1967, 21 U.S.T. 607, 721 U.N.T.S. 324;

d)   Declaration on the Protection of All Persons From Being Subjected to Torture and
     Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 3452
     (XXX), annex, 30 U.N. GAOR Supp. (No. 34) at 91, U.N. Doc. A/10034 (1975);

e)   Inter-American Convention to Prevent and Punish Torture, Dec. 9, 1985, 25
     I.L.M. 519;

f)   American Declaration of Rights and Duties of Man, O.A.S. Res. XXX, adopted
     by the Ninth International Conference of American States (1948), reprinted in
     Basic Documents Pertaining to Human Rights in the Inter-American System,
     OEA/Ser. L.V/II.82 doc. 6 rev. 1 at 17 (1992);

g)   Inter-American Convention on the Forced Disappearance of Persons, June 9,
     1994, 33 I.L.M. 1529;

h)   United Nations General Assembly Resolution and Declaration on the Protection
     of All Persons from Enforced Disappearance, Dec. 18, 1992, 32 I.L.M. 903;

i)   The Charter of the International Military Tribunal, Nuremberg, August 8, 1945,
     confirmed by G.A. Res. 3, U.N. Doc. A/50 (1946);

j)   The Rome Statute of the International Criminal Court, United Nations Diplomatic
     Conference of Plenipotentiaries on the Establishment of an International Criminal
     Court, July 17, 1998, U.N. Doc. A/CONF. 183/9, reprinted in 37 I.L.M. 999;

k)   Statute for the International Criminal Tribunal for Rwanda, Nov. 8, 1994, U.N. SCOR, 49th Sess., 3453rd mtg., at 1, U.N. Doc. S/RES/955, reprinted in 33 I.L.M. 1598 (1994);

l)   Declaration on the Elimination of Violence Against Women, G.A. res. 48/104, 48 U.N. GAOR Supp. (No. 49) at 217, U.N. Doc. A/48/49 (1993); and

m)   Inter-American Convention on the Prevention, Punishment, & Eradication of Violence Against Women, 33 I.L.M. 1534 (entered into force Mar. 5, 1995).

10.   Plaintiffs' causes of action also arise under:

a)   Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 Note);

b)   28 U.S.C. § 1350;

c)   The laws of Chile;

d)   Laws of the District of Columbia, including but not limited to common law principles of wrongful death, assault and battery, intentional infliction of emotional distress, and false imprisonment;

e)   Customary international law.

11.   Personal jurisdiction and venue are proper in this Court under 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b) because a substantial part of the acts and omissions giving rise to the claims occurred in this district and Defendants purposefully availed themselves of this forum. The exercise of jurisdiction over Defendant Townley is reasonable under the circumstances. Upon information and belief, Defendant Townley's whereabouts are unknown, as he is currently in the Witness Protection Program.

12.    The allegations in this complaint should not be construed as seeking relief under the

Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671-2680.  As to such claims, and any

claims for which Plaintiffs are required to exhaust administrative remedies prior to suit, Plaintiffs

have made the appropriate administrative filings, and will amend this complaint when such

filings are resolved.  Plaintiffs argue that the acts complained of are actionable because they lie

outside Defendant Henry Kissinger's scope of employment, in part because no sovereign may

authorize conduct that violates peremptory norms of international law.  Plaintiffs do not concede

that the acts alleged herein were properly performed within the scope of employment, as these

acts can never be properly within the scope of lawful employment.

13.    The United States does not enjoy sovereign immunity from this suit because, among other

reasons:

      a.    the acts complained of are violations of peremptory norms of customary and

          codified international law as to which no person or state may claim immunity;

      b.    Plaintiffs are also seeking declaratory relief, and the Administrative Procedures

          Act waives sovereign immunity in actions "seeking relief other than money

          damages and stating a claim that an agency or an officer or employee thereof

          acted or failed to act in an official capacity or under color of legal authority".  5

          U.S.C. § 702 (1976).

**PRELIMINARY STATEMENT**

14.    This action seeks declaratory relief as well as compensatory and punitive damages for

torture; cruel, inhuman or degrading treatment; false imprisonment; arbitrary detention; wrongful

death; summary execution; assault and battery; forced disappearance; crimes against humanity;

violence against women; intentional infliction of emotional distress; and other violations of domestic and international law.

15.     Plaintiffs, family members of victims and themselves victims of these violations, institute this action against former National Security Advisor and Secretary of State Henry Alfred Kissinger; former Chilean DINA (Chilean secret intelligence service) agent and U.S. citizen Michael Vernon Townley, and/or the United States Government ("Defendants"), for funding, assisting, supporting, training, encouraging, condoning, benefiting from, aiding and abetting, acting recklessly, acting jointly and conspiring with known human rights violators who systematically violated Plaintiffs' and victims' human rights as recognized by the laws of the United States, the laws of Chile, the laws of the District of Columbia, and international law.

16.     On September 11, 1973, the Chilean Military, with Henry Kissinger's ongoing and continuous knowledge, funding, assistance and encouragement, conspired to stage a coup d'état that overthrew the democratically elected president, Dr. Salvador Allende, forcing the nation of Chile into the foreseeable and actual period of widespread violence and terror that lasted for seventeen years.

17.     Plaintiffs and their relatives are direct victims of that violence and terror.

18.     Defendants knowingly assisted and recklessly encouraged and contributed extensively to the state terror apparatus operating in Chile.  As such, Defendants are liable for the harms caused to Plaintiffs and their relatives, and for the systematic violation of their human rights.

## PARTIES

### Plaintiffs

19.     Except for Carol Mitchell, who is serving as personal representative of the estates of Carmelo Soria and Freddy Taberna, all Plaintiffs in this action are direct victims and/or relatives

of direct victims of the state-sponsored repressive apparatus that ruled Chile following the 1973 coup. Plaintiffs bring this suit on behalf of their family members and/or on their own behalf.

20.     Plaintiff Laura González-Vera (Plaintiff González-Vera) brings this suit on her own behalf. Plaintiff González-Vera is a citizen of Spain. Plaintiff González-Vera has the capacity to sue under Fed. R. Civ. P. 17(a).

21.     Plaintiff Josefina Llidó Mengual (Plaintiff Llidó) brings this suit on her own behalf, and on behalf of her brother Father Antonio Llidó Mengual (Father Llidó). Father Llidó was, at all times material herein, a Catholic priest who lived and worked in Chile. Father Llidó is a citizen of Spain. Plaintiff Llidó is a citizen of Spain. Plaintiff Llidó has the capacity to sue under Fed. R. Civ. P. 17(a).

22.     Plaintiff René Emilio Astudillo Rojas (Plaintiff Astudillo) brings this suit on his own behalf, and on behalf of his father, Enrique Astudillo Álvarez, and his brothers, Ramón Astudillo Rojas and Omar Astudillo Rojas. Enrique Astudillo Álvarez, Ramón Astudillo Rojas, and Omar Astudillo Rojas were Chilean citizens. Plaintiff Astudillo is a citizen of Chile. Plaintiff Astudillo has the capacity to sue under Fed. R. Civ. P. 17(a).

23.     Plaintiff Erika Hennings Cepeda (Plaintiff Hennings) brings this suit on her own behalf, and on behalf of her husband, Alfonso Chanfreau Oyarce (Chanfreau). Chanfreau is a dual citizen of Chile and France. Plaintiff Hennings is a Chilean citizen. Plaintiff Hennings has the capacity to sue under Fed. R. Civ. P. 17(a).

24.     Plaintiff Germán Berger Hertz (Plaintiff Berger) brings this suit on his own behalf, and on behalf of his father, Carlos Berger Guralnik (Berger). Carlos Berger was a Chilean citizen. Plaintiff Berger is a Chilean citizen. Plaintiff Berger has the capacity to sue under Fed. R. Civ. P. 17(a).

25.     Plaintiff Raúl Lorca Tobar (Plaintiff Lorca) brings this suit on his own behalf, and on behalf of his brother, Carlos Enrique Lorca Tobar (Lorca).  Carlos Lorca is a Chilean citizen. Plaintiff Raúl Lorca is a Chilean citizen.  Plaintiff Raúl Lorca has the capacity to sue under Fed. R. Civ. P. 17(a).

26.     Plaintiff Isolina Lucia Ramírez Ramírez (Plaintiff Ramírez) brings this suit on her own behalf, and on behalf of her husband, Mario Zamorano Donoso (Zamorano).  Zamorano is a Chilean citizen.  Plaintiff Ramírez is a Chilean citizen.  Plaintiff Ramírez has the capacity to sue under Fed. R. Civ. P. 17(a).

27.     Plaintiff Gladys Marín Millie (Plaintiff Marín) brings this suit on her own behalf, and on behalf of her husband, Jorge Muñoz Poutays (Muñoz Poutays).  Muñoz Poutays is a Chilean citizen.  Plaintiff Marín is a Chilean citizen and has the capacity to sue under Fed. R. Civ. P. 17(a).

28.     Alvaro Muñoz Marín (Plaintiff Muñoz Marín), son of Jorge Muñoz Poutays, brings this suit on his own behalf.  Plaintiff Muñoz is a Chilean citizen and has the capacity to sue under Fed. R. Civ. P. 17(a).

29.     Plaintiff Carlos Reimundo Valero Vargas (Valero) brings this suit on his own behalf. Plaintiff Valero is a Chilean citizen.  Plaintiff Valero has the capacity to sue under Fed. R. Civ. P. 17(a).

30.     Plaintiff Jinny Arancibia (Plaintiff Arancibia) brings this suit on her own behalf.  Plaintiff Arancibia is a Chilean citizen.  Plaintiff Arancibia has the capacity to sue under Fed. R. Civ. P. 17(a).

31.     Plaintiff Carol Mitchell is the personal representative of the estate of Carmelo Soria Espinoza (Soria) and brings this suit on behalf of Soria.  Soria was, at all times material herein, a

10

United Nations diplomat who lived and worked in Chile. Soria was a dual citizen of Chile and Spain. Plaintiff Mitchell is a U.S. citizen and resident in the District of Columbia. Plaintiff Mitchell has the capacity to sue under Fed. R. Civ. P. 17(a) and 17(b).

32.     Plaintiff Carol Mitchell is the personal representative of the estate of Freddy Taberna Gallegos (Taberna) and brings this suit on behalf of Taberna. Taberna was a Chilean citizen. Plaintiff Mitchell is a U.S. citizen and resident in the District of Columbia. Plaintiff Mitchell has the capacity to sue under Fed. R. Civ. P. 17(a) and 17(b).

### Defendants

33.     Defendant Henry Alfred Kissinger was Assistant to the President for National Security Affairs from January 20, 1969 to November 3, 1975, and Secretary of State from September 22, 1973 until January 20, 1977. Defendant Kissinger knowingly provided practical assistance and encouragement to the Chilean repressive regime with reckless disregard for the lives and well-being of the Plaintiffs and their families. Such assistance and encouragement had a substantial effect on the perpetration of the violations alleged in this complaint. Defendant Kissinger is being sued in his individual capacity, as well as in his official capacity as National Security Advisor and Secretary of State.

34.     Defendant Michael Vernon Townley is a U.S. citizen who served as a DINA agent in Chile during the relevant period, 1973 through 1977. Defendant Townley knowingly provided practical assistance and encouragement to the Chilean repressive regime with reckless disregard for the lives and well-being of the Plaintiffs and their families. Such assistance and encouragement had a substantial effect on the perpetration of the violations alleged in this complaint. Defendant Townley was the owner of the house in which Carmelo Soria was brutally tortured and extrajudicially killed. Defendant Townley was present during the torture and

extrajudicial killing of Carmelo Soria. Upon information and belief, Defendant Townley is

under the protection of the U.S. Witness Protection Program. Pursuant to 18 U.S.C.A. § 3523(a),

Plaintiffs request the U.S. Attorney General to make reasonable efforts to serve a copy of this

process on Defendant Townley at Defendant Townley's last known address, and to notify the

Plaintiffs whether and when such process has been served.

35.     Defendant United States, through several of its agencies, including the Central

Intelligence Agency, the Department of State, and the Department of Defense, knowingly

provided practical assistance and encouragement to the Chilean repressive regime with reckless

disregard for the lives and well-being of the Plaintiffs and their families. Such assistance and

encouragement had a substantial effect on the perpetration of the violations alleged in this

complaint.

<strong>FACTS COMMON TO ALL CLAIMS</strong>

<strong><u>Introduction</u></strong>

36.     In 1970, Dr. Salvador Allende was democratically elected President by the citizens of

Chile. In order to prevent and remove Dr. Allende from governing Chile, the United States and

Henry Kissinger supported, assisted, and recklessly encouraged members of the Chilean military

who were willing to organize a coup against Dr. Allende.

37.     The United States and Henry Kissinger provided money and guns to coup plotters to

kidnap and eliminate any person standing in the way of a successful coup.

38.     Despite being fully aware of the foreseeable consequences of a coup, and despite having

failed at several coup attempts, Defendants United States and Henry Kissinger continued to assist

and encourage certain groups of the Chilean military to overthrow Dr. Allende.

39.    The Defendants' reckless actions substantially led to the coup of September 11, 1973 and the eventual repressive regime of Augusto Pinochet.

40.    In an attempt to eliminate and suppress any political opposition to the military dictatorship of Augusto Pinochet, thousands of civilians, including the Plaintiffs and/or their families, were detained, tortured, killed and/or disappeared following the coup.

41.    While fully aware of the gross human rights violations that were occurring and would continue to occur after the coup, the Defendants continued their support and encouragement of the repressive regime.

**1970:  Assistance to Coup Plotters and Knowledge of Foreseeable Violence Against Plaintiffs.**

42.    Henry Kissinger, being fully aware of the carnage that would follow, supported the repressive regime before, during and after the coup of 1973.

43.    Between September and October of 1970, Henry Kissinger established contacts with known terrorists and assisted them by providing the terrorists with weapons to facilitate a coup against Dr. Allende.  To this end, Henry Kissinger acted outside the scope of his employment by purposefully acting outside the proper channels of Congressional oversight of covert operations.

44.    On September 8, 1970, Henry Kissinger, as National Security Advisor and Chairman of the National Security Council's 40 Committee in charge of covert operations, asked the Central Intelligence Agency (CIA) to make "a cold-blooded assessment of . . . the pros and cons and problems and prospects involved should a Chilean military coup be organized now with U.S. assistance."

45.    The assessment was that a coup would result in about 10,000 deaths.  U.S. government declassified documents state that Kissinger was also informed that "carnage could be

considerable and prolonged, i.e., civil war," and, that Kissinger had "asked [the CIA] to provoke chaos in Chile . . . which is unlikely to be bloodless."

46.     Knowing the repercussions of the proposed coup, Kissinger continued to support the coup plotters.

47.     The first attempt at a coup occurred in October 1970, when the U.S. gave two groups of coup plotters weapons and money to kidnap and eliminate General René Schneider (the Commander-in-Chief of the Chilean Army), who was considered to be the main obstacle to a successful coup.  The coup plotters were given assurances of strong support from the U.S. government both before and after a coup. Henry Kissinger approved a payment of $50,000 that would be given to the coup plotters for a successful coup attempt.

48.     Henry Kissinger was informed that the coup would be used by the military as a pretext to eliminate all political opposition, yet he recklessly continued to support the coup efforts.

49.     On October 16, 1970, in an effort to promote a larger coup effort, Henry Kissinger sent a message through the CIA to the coup plotters, telling them to "stay in touch" and that the "time will come when you together with all your other friends can do something."  Kissinger added: "You will continue to have our support."

50.     On October 22, 1970, armed with the weapons given to them by the U.S. military attaché in Santiago, the coup plotters proceeded to kidnap General Schneider, who was shot during the kidnapping attempt.  General Schneider died of his wounds three days later.

51.     Although no successful coup followed the assassination of Gen. Schneider, one of the coup plotters was subsequently paid $35,000 by the CIA.

52.     In order to conceal his actions from Congress, Henry Kissinger had coordinated a "major effort to convince all here, in Washington and elsewhere of [Henry Kissinger and the CIA's]

total non-involvement in the campaign [to eliminate General Schneider and promote a coup]."

Henry Kissinger constantly "emphasized the need for secrecy from [the] USG and the world",

and deliberately misled Congress as to U.S. involvement in promoting the coup in Chile.

### 1970 to 1973:  Henry Kissinger and the CIA Continued to Support and Encourage a Military Coup in Chile.

53.     After failing to instigate a coup with the death of General Schneider in 1970, Henry

Kissinger and the CIA designed secret covert operations designed to destabilize Chile's economy

and promote a coup against Dr. Allende.

54.     To this end, Henry Kissinger and the CIA provided substantial funds between 1970 and

1973, at least $6.5 million, to destabilize the Allende government.  Throughout this period,

Henry Kissinger and the CIA developed a plan to penetrate and bribe all the major Chilean

political parties, support anti-regime demonstrations, finance the opposition press and other

groups, implement a false propaganda campaign, and maintain a close relationship with possible

coup plotters within the military.

55.     The CIA also encouraged several coup plotters by telling them that "if [a] military junta

took over [Chile], [the] U.S. could help in many ways: financially, with food, agricultural loans,

etc." All of this encouragement and support was carried out with full knowledge that a coup

would result in massive repression against civilians.

### September 11, 1973:  The Coup

56.     Henry Kissinger's plan finally came to fruition on September 11, 1973, when, after years

of covert support and encouragement, a military junta bombed the Presidential Palace and

violently took over Chile.

57.     The immediate aftermath of the coup echoed the bloody assessment that had been given to

Henry Kissinger when he had requested "a cold-blooded assessment of the pros and cons and

problems and prospects involved should a Chilean military coup be organized now with U.S. assistance."

58.     Just as expected, hundreds of civilians, including the Plaintiffs and/or their families, were detained, brutally tortured, and executed in order to eliminate any ideological opposition to the new military junta.

59.     On October 1, 1973, the U.S. Navy Section in Valparaiso, Chile, characterized the coup d'état in a very positive light and claimed ownership for the coup, referring to the event as "our D-Day" and as being "close to perfect."

**Post-Coup Knowledge, Support, and Encouragement of the Military Repression**

60.     Following the coup, from 1973 until 1978, brutal repression was directly coordinated and enforced by the Chilean Directorate of National Intelligence (DINA). The DINA's primary responsibility was to control the activities of, and to eliminate the individuals associated – formally and informally – with, the political left. The DINA engaged in the systematic practice of eliminating ideological opposition to the military regime. The DINA operated through a system of indiscriminate arrests, torture, execution, and disappearances aimed at eliminating the existing opposition and instigating a reign of terror that would avert further opposition.

61.     The Chilean National Commission of Truth and Reconciliation (Truth and Reconciliation Commission) established by democratically elected President Patricio Alwyn, pursuant to Supreme Decree 335 of April 1990, together with the Chilean Government's report to the UN Committee Against Torture, concluded that the DINA played a central role in the policy of systematic and widespread human rights violations in Chile. Similarly, they concluded that the DINA developed a variety of criminal tactics, including killings and forced disappearances of

individuals considered to be enemies of the military regime. These reports found that these violations required intelligence coordination and planning at the highest levels of the state.

62.     Department of Defense declassified documents, which were available to Henry Kissinger during the relevant time period, indicate that the DINA had become "so notorious as the [government of Chile's] chief instrument of repression, and so tied by its operations and training to abusive activities, that elimination, or a complete overhaul, seems the only remedy." Similar documents describe how DINA interrogation and torture "techniques are straight out of the Spanish Inquisition and often leave the person interrogated with visible bodily damage."

63.     Henry Kissinger was well aware of the gross human rights violations committed by the DINA in Chile. Days after the coup, on September 20, 1973, the Assistant Secretary of State for Inter-American Affairs informed Henry Kissinger that the Chilean government was holding 5,000 political prisoners in the National Stadium. CIA officials were aware of and reported that General Pinochet was conducting a severe campaign against leftists and perceived political enemies in the early months after the coup, as evidenced by the CIA's report of the location of 27 bodies that showed signs of torture and mutilation, and had been dumped into a river. Only two months after the coup, Henry Kissinger received notice that 13,500 individuals had been arrested, 7,000-8,000 had been held in the National Stadium, 2,000 individuals had departed from Chile in search of asylum, between 100-320 executions had occurred, and as many as 3,000 individuals had died. These numbers were much higher than the "official" numbers being released at the time by the dictatorship, yet the U.S. did not release this information to the public. As late as 1975, the CIA was still reporting that serious abuses were common, evidenced by its finding that 3,811 political prisoners had been or were being held.

64.     The DINA were directly responsible for the violations against the Plaintiffs and their families.  At least five of the victims in this complaint (Soria, Chanfreau, Lorca, Muñoz Poutays, and Zamorano) were taken to Villa Grimaldi, a DINA torture and detention center, where they were tortured by DINA agents.  Some of the DINA agents who were directly involved in the torture and violations of the Plaintiffs and/or their families were taught counterinsurgency and torture tactics in the early 1970s at the U.S. Army School of the Americas, a U.S. Department of Defense facility created to train Latin American soldiers in combat and counter-insurgency tactics.  DINA agents attended the School of the Americas before, during, and after the 1973 coup, where they were taught how to use torture tactics as part of their counter-insurgency training.  The U.S. Department of Defense has acknowledged that teaching manuals used by the School of the Americas indeed advocated torture and other cruel and inhuman treatment as part of the school's counter-insurgency training.  The techniques learned by DINA agents at the School of the Americas were used to inflict torture and other cruel and inhuman treatments on Plaintiffs.

65.     Assistance to DINA agents continued well after the 1973 coup.  The CIA even established and maintained a close relationship with the person in direct control of the DINA between 1973 and 1978, General Manual Contreras Sepúlveda.  General Contreras was notorious for implementing a plan to systematically eliminate all political opposition not only in Chile, but in other countries of South America.  Contreras' actions as director of the DINA resulted in the murders, torture, and forced disappearances of Plaintiffs and Plaintiffs' relatives.  The CIA was well aware of Contreras' actions as head of the DINA.

66.     Defendant Townley was a member of the DINA and was actively involved in the torture and extrajudicial killing of Carmelo Soria.

67.    In 1975, the CIA recommended establishing a paid relationship with Contreras.
According to a 2000 Congressional investigation known as the Hinchey Report, CIA Deputy
Director of Intelligence Vernon Walters even received Contreras in Washington in August 1975
and paid him $10,000 as an informant.  The U.S. Government therefore sought and received the
benefits of this relationship and continued to encourage and support a known human rights
abuser.  In its investigation, the Hinchey Report concluded that the CIA had made a mistake in
"balancing the nature and severity of the human rights abuse [in Chile] against the potential
intelligence value of continuing the relationship [with Contreras]."

68.    Despite the knowledge of the DINA's brutal record, the U.S. Government and Henry
Kissinger continued to support the regime and were reluctant to speak out against these
atrocities.

69.    Rather than condemning the abuses, Henry Kissinger, through the 40 Committee,
authorized the CIA to "assist the junta in gaining a more positive image, both at home and
abroad."  Chilean individuals who had collaborated with the CIA prepared a disinformation
document known as the "White Book" intended to justify the overthrow of President Allende.

70. Additionally, the CIA paid for Chilean military spokesmen to travel to other countries to
promote the junta's propaganda.  The CIA, in turn, supplied its own pro-military dictatorship
propaganda by using U.S. media assets.

71.    The U.S. also supplied communications installations in the Panama Canal zone so that
Contreras and other chiefs of intelligence from other South American countries could coordinate
information necessary to locate and eliminate ideological opposition in Chile and the region – a
plan called Operation Condor.

72.     United States and Henry Kissinger's support of the dictatorship's agenda is further illustrated by the fact that military assistance and sales to Chile grew significantly during the years when the largest number of human rights abuses occurred.

73.     Additionally, Henry Kissinger continued to express disagreement with any attempt to limit Pinochet's economic and military power, be it by U.S. Congress or by the international community. For example, in June 1976, Henry Kissinger stated to Chilean Foreign Minister Carvajal: "I am disappointed that the [U.S. Congress] saw fit to retain restrictions on economic assistance to Chile and to impose a ban on future military sales."

74.     Further, Henry Kissinger misled the international community into thinking that Henry Kissinger and the U.S. opposed General Pinochet's brutal repression. In 1976, at the meeting of the General Assembly of the Organization of American States, Henry Kissinger gave a speech in which he advised Pinochet to achieve some progress on human rights to improve Chile's image in the U.S. Congress. Nevertheless, behind closed doors, Henry Kissinger indicated to Pinochet that the U.S. Government was sympathetic to Pinochet's goal of eliminating any ideological opposition. A recently declassified memorandum of a conversation between Pinochet and Henry Kissinger revealed that Henry Kissinger remarked, "[t]he speech is not aimed at Chile. I wanted to tell you about this. My evaluation is that you are a victim of all left-wing groups around the world, and that your greatest sin was that you overthrew a government which was going Communist....We welcomed the overthrow of the Communist-inclined government here. We are not out to weaken your position." Although he advocated human rights in his public speeches, Henry Kissinger privately supported, assisted and encouraged the human rights violations in Chile of which Plaintiffs and their families complain.

## VICTIMS' INFORMATION

75.     Upon information and belief, Carmelo Soria Espinoza was kidnapped on July 14, 1976 by members of the DINA brigade known as "Mulchen." Soria was driven in his own vehicle to the house of defendant Michael Townley at 4925 Via Naranja, Lo Curro, Santiago, where he was tortured and killed by DINA agents. Defendant Townley was present during Soria's torture. Upon information and belief, four DINA officials, including a Chilean Army Major and three Captains, placed Soria's body in his automobile and pushed Soria's automobile down a ravine.

76.     Four of the people involved in Carmelo Soria's torture and subsequent death were trained at the United States School of the Americas. First Lieutenant Miguel Krassnoff took a course in 1974 on Urban Counterinsurgency and is notorious for the torture techniques he used at Villa Grimaldi. Col. Jaime Lepe Orellana and Major Guillermo Humberto Salinas Torres also attended the School of the Americas in 1968 and 1974, respectively. Col. Pablo Belmar, not only attended the School of the Americas in 1968, but also was invited to teach at the School of the Americas in 1987 as a Guest Instructor lecturing on human rights, despite his well-known involvement in Soria's torture and extrajudicial killing. The techniques learned by these DINA agents at the School of the Americas were used to inflict torture and other cruel and inhuman treatments on Carmelo Soria.

77.     Plaintiff Mitchell, as personal representative of the estate of Carmelo Soria Espinoza, brings this suit on behalf of Soria's estate for torture; cruel, inhuman or degrading treatment; false imprisonment; arbitrary detention; wrongful death; summary execution; assault and battery; crimes against humanity; and intentional infliction of emotional distress against Defendants Kissinger, the United States, and Townley.

78.    In addition, Plaintiff González-Vera, wife of Soria, brings this suit on her own behalf for

torture; cruel, inhuman or degrading treatment; false imprisonment; arbitrary detention; wrongful

death; summary execution; assault and battery; crimes against humanity; and intentional

infliction of emotional distress against Defendants Kissinger, the United States, and Townley.

79.    Upon information and belief, Father Antonio Llidó Mengual was detained on an

undetermined date in September 1974 and taken to the José Domingo Cañas detention center.

Upon information and belief, Father Llidó was tortured repeatedly at the José Domingo Cañas

detention center.  Father Llidó was severely beaten and subjected to electric shock for several

hours at a time.  Upon information and belief, Father Llidó was also detained at Cuatro Alamos,

another DINA detention center located in Santiago, Chile.  Father Llidó has been missing since

October 1974.

80.    Plaintiff Josefina Llidó Mengual, sister of Father Llidó, brings this action on behalf of her

brother for torture; cruel, inhuman or degrading treatment; false imprisonment; arbitrary

detention; assault and battery; forced disappearance; crimes against humanity; and intentional

infliction of emotional distress against Defendants Kissinger and the United States.

81.    In addition, Plaintiff Llidó Mengual, sister of Father Llidó, brings this action on her own

behalf for torture; cruel, inhuman or degrading treatment; false imprisonment; arbitrary

detention; assault and battery; forced disappearance; crimes against humanity; and intentional

infliction of emotional distress against Defendants Kissinger and the United States.

82.    Upon information and belief, Enrique Astudillo Álvarez, Omar Astudillo Rojas, and

Ramón Astudillo Rojas were detained on October 7, 1973 by the *Carabineros* (Chilean military

police) of Isla de Maipo.  With their hands tied behind their backs, they were constantly beaten,

insulted, and threatened with death by the *Carabineros*.  In 1978, their bodies were found in a

mass grave in an abandoned oven at a limestone mine near Lonquén. The family considers Enrique Astudillo Álvarez, Ramón Astudillo Rojas, and Omar Astudillo Rojas as still missing because their remains have not been recovered and returned to the family for a proper burial.

83.     Plaintiff René Emilio Astudillo Rojas, son of Enrique Astudillo Álvarez and brother of Ramón and Omar Astudillo Rojas, brings this action on behalf of his father and brothers for torture; cruel, inhuman or degrading treatment; false imprisonment; arbitrary detention; assault and battery; forced disappearance; crimes against humanity; and intentional infliction of emotional distress against Defendants Kissinger and the United States.

84.     In addition, Plaintiff René Emilio Astudillo Rojas, son of Enrique Astudillo Álvarez and brother of Ramón and Omar Astudillo Rojas, brings this action on his own behalf for torture; cruel, inhuman or degrading treatment; false imprisonment; arbitrary detention; assault and battery; forced disappearance; crimes against humanity; and intentional infliction of emotional distress against Defendants Kissinger and the United States.

85.     Upon information and belief, Alfonso Chanfreau Oyarce was detained by DINA agents on July 30, 1974. On July 31, 1974, Chanfreau's wife, Erika Hennings Cepeda was detained by two DINA agents, blindfolded, and taken to Londres 38, a detention and torture center in Santiago. For the next thirteen days, DINA agents tortured Chanfreau and Hennings in front of each other. Hennings was raped and tortured with electricity, and Chanfreau was brutally tortured daily, for hours at a time. On three occasions, Chanfreau was taken to Villa Grimaldi, which at that time served as headquarters of DINA's metropolitan brigade, where he was again brutally tortured. Although Erika Hennings Cepeda was later released, her husband Alfonso Chanfreau Oyarce has remained disappeared.

86.    Plaintiff Erika Hennings Cepeda, wife of Alfonso Chanfreau Oyarce, brings this action on behalf of her husband for torture; cruel, inhuman or degrading treatment; false imprisonment; arbitrary detention; assault and battery; forced disappearance; crimes against humanity; and intentional infliction of emotional distress; against Defendants Kissinger and the United States.

87.    Plaintiff Erika Hennings Cepeda, wife of Alfonso Chanfreau Oyarce, brings this action on her own behalf for torture; cruel, inhuman or degrading treatment; false imprisonment; arbitrary detention; assault and battery; forced disappearance; crimes against humanity; intentional infliction of emotional distress; and violence against women against Defendants Kissinger and the United States.

88.    Upon information and belief, Carlos Berger Guralnik was abducted on October 19, 1973 by DINA agents engaged in the "Caravan of Death" (Caravan).  On October 16, 1973, under the direction of Chilean General Arellano Stark, a military dispatch left Santiago headed north to several rural towns where DINA agents removed political prisoners from area prisons in order to execute them.  Prisoners were executed as the Caravan proceeded through different towns for approximately 15 days.  Upon information and belief, a total of 75 people, including Carlos Berger, were illegally removed from prisons and tortured, stabbed, shot, and extrajudicially killed by DINA agents during the Caravan.  A number of bodies, including Berger's body, have never been found.

89.    Plaintiff Germán Berger Hertz, son of Carlos Berger Guralnik, brings this action on behalf of his father for torture; cruel, inhuman or degrading treatment; false imprisonment; arbitrary detention; assault and battery; forced disappearance; crimes against humanity; and intentional infliction of emotional distress against Defendants Kissinger and the United States.

90.    Plaintiff Berger, son of Carlos Berger Guralnik,  brings this action on his own behalf for torture; cruel, inhuman or degrading treatment; false imprisonment; arbitrary detention; assault and battery; forced disappearance; crimes against humanity; and intentional infliction of emotional distress against Defendants Kissinger and the United States.

91.    Upon information and belief, Carlos Enrique Lorca Tobar was abducted by DINA agents on June 25, 1975, when ten DINA vehicles raided a political party meeting place, and DINA agents abducted Lorca.  He was handcuffed, his glasses were taken from him, and he was hauled to Villa Grimaldi where he was savagely tortured mentally and physically to the point of breaking two of his limbs.  Lorca was last seen alive on July 12, 1975.  Lorca was a respected doctor and a Chilean Congressman.  As a member of the Socialist Party, he had been elected in March 1973 to the House of Representatives to represent the Southern Province of Valdivia. Through an unofficial dialogue effort known as the *Mesa de Diálogo*, the Chilean government declared on January 6, 2001 that Lorca's body had been thrown out to sea.  As this finding was not supported by any evidence, Plaintiff Raúl Lorca Tobar, brother of Carlos Enrique Lorca Tobar, believes that his brother is still "disappeared."

92.    Plaintiff Raúl Lorca, brother of Carlos Lorca Tobar, brings this action on behalf of his brother for torture; cruel, inhuman or degrading treatment; false imprisonment; arbitrary detention; assault and battery; forced disappearance; crimes against humanity; and intentional infliction of emotional distress against Defendants Kissinger and the United States.

93.    In addition, Plaintiff Raúl Lorca, brother of Carlos Lorca Tobar, brings this action on his own behalf for torture; cruel, inhuman or degrading treatment; false imprisonment; arbitrary detention; assault and battery; forced disappearance; crimes against humanity; and intentional infliction of emotional distress against Defendants Kissinger and the United States.

94.    Upon information and belief, Jorge Muñoz Poutays was detained on May 4, 1976 by agents of the DINA. Jorge Muñoz Poutays was a civil engineer and member of the Central Committee of the Communist Party. Upon information and belief, beginning on April 30, 1976, DINA agents staged a trap at a domicile located at Calle Conferencia 1587, Santiago, where the DINA knew that opposition political party leaders, including Muñoz, would be holding a meeting. DINA agents first kidnapped and tortured the owner of the house and members of his family. DINA agents kept the family imprisoned and under constant vigilance in their home. As political party members arrived for the meeting, DINA agents arrested and detained them. Jorge Muñoz Poutays was then taken to the torture and detention facility at Villa Grimaldi. He is still disappeared.

95.    Plaintiff Gladys Marín Millie, wife of Jorge Muñoz Poutays, brings this action on behalf of her husband for torture; cruel, inhuman or degrading treatment; false imprisonment; arbitrary detention; assault and battery; forced disappearance; crimes against humanity; and intentional infliction of emotional distress against Defendants Kissinger and the United States.

96.    Plaintiff Gladys Marín Millie, wife of Jorge Muñoz Poutays, brings this action on her own behalf for torture; cruel, inhuman or degrading treatment; false imprisonment; arbitrary detention; assault and battery; forced disappearance; crimes against humanity; and intentional infliction of emotional distress against Defendants Kissinger and the United States.

97.    Plaintiff Alvaro Muñoz Marín, son of Jorge Muñoz Poutays, brings this action on his own behalf for torture; cruel, inhuman or degrading treatment; false imprisonment; arbitrary detention; assault and battery; forced disappearance; crimes against humanity; and intentional infliction of emotional distress against Defendants Kissinger and the United States.

98.     Upon information and belief, Mario Zamorano Donoso was detained on May 4, 1976 by

agents of the DINA from the domicile located at Calle Conferencia 1587, Santiago.  Upon

information and belief, DINA agents shot Zamorano in the leg immediately after entering the

domicile.  DINA agents then took Zamorano to an undisclosed location; he has been missing

since May 4, 1976.

99.     Plaintiff Ramírez, wife of Mario Zamorano Donoso, brings this action on behalf of her

husband for torture; cruel, inhuman or degrading treatment; false imprisonment; arbitrary

detention; assault and battery; forced disappearance; crimes against humanity; and intentional

infliction of emotional distress against Defendants Kissinger and the United States.

100.    In addition, Plaintiff Ramírez, wife of Mario Zamorano Donoso, brings an action on her

own behalf for torture; cruel, inhuman or degrading treatment; false imprisonment; arbitrary

detention; assault and battery; forced disappearance; crimes against humanity; and intentional

infliction of emotional distress against Defendants Kissinger and the United States.

101.    Carlos Reimundo Valero Vargas was detained on September 11, 1973 by the

*Carabineros*.  The *Carabineros* took Plaintiff Valero to a detention center where they detained

and brutally tortured him for two days.  During this two-day period, the *Carabineros* beat

Plaintiff repeatedly with the butt of a gun, threatened him with death, and pretended to shoot

him.  The *Carabineros* then took Plaintiff Valero to detention centers at the Chilean Stadium and

the National Stadium, where they detained him until approximately October 27, 1973.  During

his detention at the Chilean and National Stadiums, military officials physically and

psychologically abused Plaintiff Valero.  During the entire period of his detention, Plaintiff

Valero witnessed the torture of others and learned that friends and acquaintances of his were

being tortured and/or killed in these detention centers. To this day, Plaintiff Valero suffers from depression as the result of his torture.

102.    Plaintiff Carlos Reimundo Valero Vargas brings this action on his own behalf for torture; cruel, inhuman or degrading treatment; false imprisonment; arbitrary detention; assault and battery; crimes against humanity; and intentional infliction of emotional distress against Defendants Kissinger and the United States.

103.    Upon information and belief, Freddy Taberna Gallegos was detained shortly after the coup in September 1973. Taberna was held at a detention center in Pisagua, Chile until October 30, 1973, when he was executed by state forces after being beaten, tortured, held incommunicado for more than a month, and sentenced to death by a military tribunal on false charges of treason without regard to his due process rights. Freddy Taberna is still "disappeared," as his remains have never been recovered. Jinny Arancibia, the wife of Freddy Taberna, was twice detained without charge. She was first detained from September 13, 1973 until September 14 or 15. Arancibia was later detained for approximately one month, from the last week in September 1973 until the end of October 1973. During her detention, Arancibia was threatened and tortured psychologically.

104.    Plaintiff Mitchell, as personal representative of the estate of Freddy Taberna, brings this action on behalf of Taberna's estate for torture; cruel, inhuman or degrading treatment; false imprisonment; wrongful death; summary execution; arbitrary detention; assault and battery; forced disappearance; crimes against humanity; and intentional infliction of emotional distress against Defendants Kissinger and the United States.

105.    Jinny Arancibia, wife of Freddy Taberna, brings this action her own behalf for torture; cruel, inhuman or degrading treatment; false imprisonment; arbitrary detention; wrongful death;

summary execution; assault and battery; forced disappearance; crimes against humanity; and intentional infliction of emotional distress against Defendants Kissinger and the United States.

## FIRST CLAIM FOR RELIEF

### (Forced Disappearance)

106.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 81 as fully set forth herein.

107.    Defendants Kissinger and United States knowingly provided practical assistance and encouragement to the Chilean repressive regime with reckless disregard for the lives and well-being of the Plaintiffs and their families. Such assistance and encouragement had a substantial effect on the forced disappearance of Father Llidó, Enrique Astudillo Álvarez, Omar Astudillo Rojas, Ramón Astudillo Rojas, Chanfreau, Berger, Lorca, Muñoz, Zamorano, and Taberna. The acts were carried out by state agents acting under color of official authority for purposes other than as lawful punishment pursuant to a conviction in accordance with due process.

108.    The acts of forced disappearance described herein constitute violations of the international treaties, agreements, conventions, and resolutions described in paragraphs 8-10 herein to which the United States is a party, and customary international law.

109.    The forced disappearances caused Plaintiffs Llidó, Astudillo, Hennings, Berger, Lorca, Marín, Muñoz Marín, Ramírez, and Arancibia to suffer prolonged severe mental anguish that continues to the present day.

110.    By virtue of Defendant United States' and Kissinger's actions and/or omissions, Plaintiff Mitchell, as personal representative of the estates of Taberna, is entitled to recover compensatory damages on behalf of his estate. Plaintiffs Llidó, Astudillo, Hennings, Berger, Lorca, Marín, Muñoz Marín, and Ramírez, are entitled to recover on behalf of the relatives they

represent. Plaintiffs Llidó, Astudillo, Hennings, Berger, Lorca, Marín, Muñoz Marín, Ramírez, and Arancibia, who suffered pecuniary losses, as well as the loss of the society, comfort, attention, services and support of their relatives, are entitled to recover on their own behalf as a result of the forced disappearance of their loved ones.

111.    Defendant United States' and Kissinger's negligent, reckless, deliberate, willful, wanton, intentional, malicious, and/or oppressive conduct gives rise to Plaintiffs' demand for punitive damages.

## SECOND CLAIM FOR RELIEF

### (Torture)

112.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 81 as fully set forth herein.

113.    Defendants Kissinger and United States knowingly provided practical assistance and encouragement to the Chilean repressive regime with reckless disregard for the lives and well-being of the Plaintiffs and their families. Such assistance and encouragement had a substantial effect on the torture inflicted upon Soria, Father Llidó, Enrique Astudillo Alvárez, Omar Astudillo Rojas, Ramón Astudillo Rojas, Hennings, Chanfreau, Berger, Lorca, Zamorano, Muñoz, Valero, Taberna, and Arancibia. The acts described herein placed Soria, Father Llidó, Enrique Astudillo Álvarez, Omar Astudillo Rojas, Ramón Astudillo Rojas, Hennings, Chanfreau, Berger, Lorca, Muñoz, Zamorano, Valero, Taberna, and Arancibia in great fear for their lives and them to suffer prolonged physical and mental pain and suffering. As a result, Plaintiffs González-Vera, Llidó, René Emilio Astudillo, Hennings, Berger, Lorca, Marín, Muñoz Marín, Ramírez, Valero, and Arancibia, suffered prolonged mental anguish that continues to the present day.

114.     Defendant Townley knowingly provided practical assistance and encouragement to
the Chilean repressive regime with reckless disregard for the lives and well-being of the
Plaintiffs and their families.  Such assistance and encouragement had a substantial effect on the
torture inflicted upon Soria.  Soria was tortured in Townley's home, in Townley's presence, and
with Townley's support.  The acts described herein placed Soria in great fear for his life and
caused him to suffer prolonged physical and mental pain and suffering.  As a result, Plaintiff
González-Vera suffered prolonged mental anguish that continues to the present day.

115.     Torture is a violation of *jus cogens* norms of international law and no sovereign is
immune from liability for a torture claim.  The acts described herein placed Soria, Father Llidó,
Enrique Astudillo Álvarez, Omar Astudillo Rojas, Ramón Astudillo Rojas, Hennings, Chanfreau,
Berger, Lorca, Muñoz, Zamorano, Valero, Taberna, and Arancibia in great fear for their lives
and caused them to suffer prolonged physical and mental pain and suffering.  As a result,
Plaintiffs González-Vera, Llidó, Astudillo, Hennings, Berger, Lorca, Marín, Muñoz Marín,
Ramírez, Valero, and Arancibia suffered prolonged mental anguish that continues to the present
day.

116.     Defendants' directed and controlled acts were such that they knew or should have
known that these acts would result in torture.  Defendants' "acquiescence" prior to the activity,
as used in Article 1 of the Convention Against Torture, demonstrates awareness of such activity
and thereafter breach of their legal responsibility.  Both the actual knowledge and willful
blindness by Defendants fall within the definition of "acquiescence" in Article 1.

117.     The acts described herein constitute torture in violation of the common law of the
United States, the statutes and common law of the District of Columbia, the laws of Chile, the
international treaties, agreements, conventions and resolutions described in paragraphs 8-10

31

herein to which the United States is party, customary international law, and *jus cogens* principles of international law.

118.     By virtue of Defendants United States', Kissinger's, and Townley's actions and/or omissions, Plaintiff Mitchell, as personal representative of the estates of Soria and Taberna, is entitled to recover compensatory damages on behalf of their estates as provided by law. Plaintiffs Llidó, Astudillo, Hennings, Berger, Lorca, Marín, and Ramírez are entitled to recover compensatory damages on behalf of the loved ones they represent. Plaintiffs González-Vera, Llidó, Astudillo, Hennings, Berger, Lorca, Marín, Muñoz Marín, Ramírez, Valero, and Arancibia are entitled to recover compensatory damages on their own behalf.

119.     Defendant United States, Kissinger's, and Townley's reckless, deliberate, willful, wanton, intentional, malicious, and/or oppressive conduct gives rise to Plaintiffs' demand for punitive damages.

### THIRD CLAIM FOR RELIEF

### (Cruel, Inhuman or Degrading Treatment)

120.     Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 81 as fully set forth herein.

121.     Defendants Kissinger and United States knowingly provided practical assistance and encouragement to the Chilean repressive regime with reckless disregard for the lives and well-being of the Plaintiffs and their families. Such assistance and encouragement had a substantial effect on the cruel, inhuman and degrading treatment inflicted upon Soria, Father Llidó, Enrique Astudillo Álvarez, Ramón Astudillo Rojas, Omar Astudillo Rojas, Hennings, Chanfreau, Berger, Lorca, Zamorano, Muñoz, Valero, Taberna, and Arancibia. The acts described herein had the intent and effect of grossly humiliating and debasing Soria, Father Llidó, Enrique Astudillo

Álvarez, Ramón Astudillo Rojas, Omar Astudillo Rojas, Hennings, Chanfreau, Berger, Lorca, Zamorano, Muñoz, Valero, Taberna, and Arancibia, causing them great fear, anguish, and inferiority, and breaking their physical or moral resistance by, among other things, the threat of imminent death. As a result, Plaintiffs González-Vera, Llidó, Astudillo, Hennings, Berger, Lorca, Marín, Muñoz Marín, Ramírez, Valero, and Arancibia suffered prolonged mental anguish that continues to the present day.

122. Defendant Townley knowingly provided practical assistance and encouragement to the Chilean repressive regime with reckless disregard for the lives and well-being of the Plaintiffs and their families. Such assistance and encouragement had a substantial effect on the cruel, inhuman and degrading treatment inflicted upon Soria. Soria suffered cruel, inhuman and degrading treatment in Townley's home, in Townley's presence, and with Townley's support. The acts described herein had the intent and effect of grossly humiliating and debasing Soria, causing him great fear and anguish, and breaking his physical or moral resistance by, among other things, the threat of imminent death. As a result, Plaintiff González-Vera suffered prolonged mental anguish that continues to the present day.

123. The acts described herein are in violation of the common law of the United States, the statutes and common law of the District of Columbia, the laws of Chile, the international treaties, agreements, conventions and resolutions described in paragraphs 8-10 herein to which the United States is party, and customary international law.

124. By virtue of Defendants' actions and/or omissions, Plaintiff Mitchell, as personal representative of the estates of Soria and Taberna, is entitled to recover compensatory damages on behalf of their estates as provided by law. Plaintiffs Llidó, Astudillo, Hennings, Berger, Lorca, Marín, and Ramírez are entitled to recover compensatory damages on behalf of the loved

ones they represent. Plaintiffs González-Vera, Llidó, Astudillo, Hennings, Berger, Lorca, Marín, Muñoz Marín, Ramírez, Valero, and Arancibia are entitled to recover compensatory damages on their own behalf.

125.    Defendant United States', Kissinger's, and Townley's negligent, reckless, deliberate, willful, wanton, intentional, malicious, and/or oppressive conduct gives rise to Plaintiffs' demand for punitive damages.

## FOURTH CLAIM FOR RELIEF

## (Crimes Against Humanity)

126.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 81 as fully set forth herein.

127.    Defendants Kissinger and United States knowingly provided practical assistance and encouragement to the Chilean repressive regime with reckless disregard for the lives and well-being of the Plaintiffs and their families. Such assistance and encouragement had a substantial effect on the execution, extermination, imprisonment, torture, rape, persecution, and/or other inhumane acts described herein against Soria, Llidó, Enrique Astudillo Alvárez, Ramón Astudillo Rojas, Omar Astudillo Rojas, Chanfreau, Hennings, Berger, Lorca, Zamorano, Muñoz, Valero, Taberna, and Arancibia. As these acts were committed as part of a widespread, systematic attack against the victims as a result of their political affiliations, such acts constitute crimes against humanity and are in violation of *jus cogens* norms. No sovereign is immune from liability for a claim of crimes against humanity. As a result, Plaintiffs González-Vera, Llidó, Astudillo, Hennings, Berger, Lorca, Ramírez, Marín, Muñoz Marín, Valero, and Arancibia suffered prolonged mental anguish that continues to the present day.

34

128.    Defendant Townley knowingly provided practical assistance and encouragement to the

Chilean repressive regime with reckless disregard for the lives and well-being of the Plaintiffs

and their families.  Such assistance and encouragement had a substantial effect on the execution,

imprisonment, torture, persecution, and other inhumane acts inflicted upon Soria. As a result,

Plaintiff González-Vera suffered prolonged mental anguish that continues to the present day.

129.    The acts described herein constitute crimes against humanity in violation of the Alien

Tort Claims Act, customary international law, the common law of the United States, the law of

the District of Columbia, the law of Chile, and the international treaties, agreements, conventions

and resolutions described in paragraphs 8-10 herein.

130.    By virtue of Defendants United States', Kissinger's, and Townley's actions and/or

omissions, Plaintiff Mitchell, as personal representative of the estates of Soria and Taberna, is

entitled to recover compensatory damages on behalf of their estates as provided by law.

Plaintiffs Llidó, Astudillo, Hennings, Berger, Lorca, Marín, and Ramírez are entitled to recover

compensatory damages on behalf of the loved ones they represent.  Plaintiffs González-Vera,

Llidó, Astudillo, Hennings, Berger, Lorca, Marín, Muñoz Marín, Ramírez, Valero, and Arancibia

are entitled to recover compensatory damages on their own behalf.

131.    Defendant United States', Kissinger's, and Townley's reckless, deliberate, willful,

wanton, intentional, malicious, and/or oppressive conduct gives rise to Plaintiffs' demand for

punitive damages.

## FIFTH CLAIM FOR RELIEF

### (Summary Execution)

132.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1

through 81 as fully set forth herein.

35

133.    The deliberate killings, under color of law, of Soria and Taberna were not authorized by a lawful judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.

134.    The acts described herein constitute summary execution in violation of the Alien Tort Claims Act, the Torture Victim Protection Act, customary international law, the common law of the United States, the statutes and common law of the District of Columbia, the laws of Chile, and the international treaties, agreements, conventions and resolutions described in paragraphs 8-10 herein.

135.    As a result of the summary execution of Soria and Taberna, Plaintiffs González-Vera and Arancibia have suffered pecuniary and non-pecuniary loss resulting from the loss of society, comfort, attention, services, and support of their husbands Soria and Taberna.

136.    By virtue of Defendant United States', Kissinger's and Townley's actions and/or omissions, Plaintiff Mitchell, as personal representative of the estates of Soria and Taberna, is entitled to recover compensatory damages on behalf of their estates as provided by law. Plaintiffs González-Vera and Arancibia, who suffered pecuniary losses, as well as the loss of the society, comfort, attention, services and support of their family members, are entitled to recover on their own behalf as a result of the forced disappearance of their loved ones.

137.    Defendant United States', Kissinger's and Townley's negligent, reckless, deliberate, willful, wanton, intentional, malicious, and/or oppressive conduct gives rise to Plaintiffs' demand for punitive damages.

## SIXTH CLAIM FOR RELIEF
### (Violence Against Women)

138.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 81 as fully set forth herein.

36

139.   Defendants Kissinger and United States knowingly provided practical assistance and encouragement to the Chilean repressive regime with reckless disregard for the lives and well-being of the Plaintiffs and their families.  Such assistance and encouragement had a substantial effect on the psychological and sexual violence committed against Plaintiff Hennings because of her gender.

140.   Plaintiff Hennings was placed in great fear for her life, and suffered physical and psychological abuse and agony.

141.   The sexual assault of Plaintiff Hennings violated her right to be free from torture, her right to equality, liberty, and security of the person, her right to equal protection under the law, and her right to be free from all forms of discrimination.  The gender violence against Plaintiff Hennings is in violation of the Alien Tort Claims Act, customary international law, and the international treaties, agreements, conventions, and resolutions described in paragraphs 8-10.

142.   By virtue of Defendant United States' and Kissinger's actions and/or omissions, Plaintiff Hennings is entitled to recover compensatory damages on their behalf as provided by law.

143.   Defendant United States' and Kissinger's reckless, deliberate, willful, wanton, intentional, malicious, and/or oppressive conduct gives rise to Plaintiff Henning's demand for punitive damages.

## SEVENTH CLAIM FOR RELIEF

### (Arbitrary Detention)

144.   Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 81 as fully set forth herein.

145.   Defendants Kissinger and United States knowingly provided practical assistance and encouragement to the Chilean repressive regime with reckless disregard for the lives and well-

being of the Plaintiffs and their families. Such assistance and encouragement had a substantial

effect on the arbitrary detention of Soria, Llidó, Enrique Astudillo Álvarez, Omar Astudillo

Rojas, Ramón Astudillo Rojas, Hennings, Chanfreau, Berger, Lorca, Zamorano, Muñoz, Valero,

Taberna, and Arancibia. These individuals were detained without a warrant, reasonable

suspicion, or notice of charges, were deprived of freedom of movement and personal liberty and

security, and were not taken to trial.

146. Defendant Townley knowingly provided practical assistance and encouragement to the

Chilean repressive regime with reckless disregard for the lives and well-being of the Plaintiffs

and their families. Such assistance and encouragement had a substantial effect on the arbitrary

detention of Soria. Soria was detained without a warrant, reasonable suspicion, or notice of

charges, was deprived of freedom of movement and personal liberty and security, and was not

taken to trial.

147. Defendant United States', Kissinger's and Townley's actions and/or omissions described

herein constitute arbitrary detention in violation of the common law of the United States, the

statutes and common law of the District of Columbia, the laws of Chile, the international treaties,

agreements, conventions and resolutions described in paragraphs 8-10 herein, and customary

international law.

148. As a result of Defendant United States', Kissinger's, and Townley's acts, Soria, Llidó,

Enrique Astudillo Álvarez, Ramón Astudillo Rojas, Omar Astudillo Rojas, Hennings, Chanfreau,

Berger, Lorca, Muñoz, Zamorano, Valero, Taberna, and Arancibia were placed in great fear for

their lives, were deprived of freedom, were separated from family, and were forced to endure

severe physical and psychological abuse and agony. This arbitrary detention caused Plaintiffs

González-Vera, Llidó, Astudillo, Hennings, Berger, Lorca, Marín, Muñoz Marín, Ramírez,

Valero, and Arancibia to suffer prolonged mental anguish that continues to the present day.

149.      By virtue of the actions and/or omissions of Defendants United States, Kissinger, and

Townley, Plaintiff Mitchell, as personal representative of the estates of Soria and Taberna, is

entitled to recover compensatory damages on behalf of their estates as provided by law.

Plaintiffs Llidó, Astudillo, Hennings, Berger, Lorca, Marín, and Ramírez are entitled to recover

compensatory damages on behalf of the loved ones they represent.  Plaintiffs González-Vera,

Llidó, Astudillo, Hennings, Berger, Lorca, Marín, Muñoz Marín, Ramírez, Valero, and Arancibia

are entitled to recover compensatory damages on their own behalf.

150.      Defendant United States', Kissinger's, and Townley's negligent, reckless, deliberate,

willful, wanton, intentional, malicious, and/or oppressive conduct gives rise to Plaintiffs'

demand for punitive damages.

## EIGHTH CLAIM FOR RELIEF

### (False Imprisonment)

151.   Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1

through 81 as fully set forth herein.

152.   Defendants Kissinger and United States knowingly provided practical assistance and

encouragement to the Chilean repressive regime with reckless disregard for the lives and well-

being of the Plaintiffs and their families.  Such assistance and encouragement had a substantial

effect on the arbitrary detention of Soria, Llidó, Enrique Astudillo Álvarez, Omar Astudillo

Rojas, Ramón Astudillo Rojas, Hennings, Chanfreau, Berger, Lorca, Muñoz, Zamorano, Valero,

Taberna, and Arancibia.  These victims were intentionally confined without lawful privilege,

deprived of personal liberty, and unlawfully detained without a warrant, probable cause,

articulable suspicion or notice of charges, and were not taken to trial.

153.    As a result of Defendant United States and Henry Kissinger's acts, Soria, Llidó, Enrique

Astudillo Álvarez, Omar Astudillo Rojas, Ramón Astudillo Rojas, Hennings, Chanfreau, Berger,

Lorca, Muñoz, Zamorano, Valero, Taberna, and Arancibia were placed in great fear for their

lives, were deprived of freedom and personal liberty, were separated from family, and were

forced to endure severe physical and psychological abuse and agony. This false imprisonment

caused Plaintiffs González-Vera, Llidó, Astudillo, Hennings, Berger, Lorca, Marín, Muñoz

Marín, Ramírez, Valero, and Arancibia to suffer prolonged mental anguish that continues to the

present day.

154.    Defendant Townley knowingly provided practical assistance and encouragement to the

Chilean repressive regime with reckless disregard for the lives and well-being of the Plaintiffs

and their families. Such assistance and encouragement had a substantial effect on the proximate

cause of the arbitrary detention of Soria. Soria was intentionally confined without lawful

privilege, deprived of personal liberty, and unlawfully detained without a warrant, probable

cause, articulable suspicion or notice of charges, and was not taken to trial.

155.    As a result of Defendant Townley's acts, Soria was placed in great fear for his life, was

deprived of freedom and personal liberty, was separated from his family, was forced to endure

severe physical and psychological abuse and agony, and ultimately suffered death. This false

imprisonment caused Plaintiff González-Vera to suffer prolonged mental anguish that continues

to the present day.

156.    Defendant United States', Kissinger's and Townley's actions described herein constitute

arbitrary detention in violation of the common law of the United States, the statutes and common

law of the District of Columbia, the laws of Chile, the international treaties, agreements,

conventions and resolutions described in paragraphs 8-10 herein, and customary international

law.

157.    By virtue of Defendant United States', Kissinger's and Townley's actions, Plaintiff

Mitchell, as personal representative of the estates of Soria and Taberna, is entitled to recover

compensatory damages on behalf of their estates as provided by law.  Plaintiffs Llidó, Astudillo,

Hennings, Berger, Lorca, Marín, and Ramírez are entitled to recover compensatory damages on

behalf of the loved ones they represent.  Plaintiffs González-Vera, Llidó, Astudillo, Hennings,

Berger, Lorca, Marín, Muñoz Marín, Ramírez, Valero, and Arancibia are entitled to recover

compensatory damages on their own behalf.

158.    Defendant United States', Kissinger's and Townley's negligent, reckless, deliberate,

willful, wanton, intentional, malicious, and/or oppressive conduct gives rise to Plaintiffs'

demand for punitive damages.

### NINTH CLAIM FOR RELIEF

#### (Wrongful Death)

159.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1

through 81 as fully set forth herein.

160.    Defendants Kissinger and United States knowingly provided practical assistance and

encouragement to the Chilean repressive regime with reckless disregard for the lives and well-

being of the Plaintiffs and their families.  Such assistance and encouragement had a substantial

effect on the wrongful death of Soria and Taberna.

161.    Defendant Townley knowingly provided practical assistance and encouragement to the

Chilean repressive regime with reckless disregard for the lives and well-being of the Plaintiffs

41

and their families. Such assistance and encouragement had a substantial effect on the wrongful death of Soria.

162.   Defendant United States', Kissinger's and Townley's actions and/or omissions described herein constitute arbitrary detention in violation of the common law of the United States, the statutes and common law of the District of Columbia, the laws of Chile, the international treaties, agreements, conventions and resolutions described in paragraphs 8-10 herein, and customary international law.

163.   As a result of the wrongful deaths of Soria and Taberna, Plaintiffs González-Vera and Arancibia have suffered pecuniary and non-pecuniary loss resulting from the loss of society, comfort, attention, services, and support of their husbands.

164.   By virtue of Defendant United States', Kissinger's and Townley's actions and/or omissions, Plaintiff Mitchell, as personal representative of the estates of Soria and Taberna, is entitled to recover compensatory damages on behalf of their estates as provided by law. Plaintiffs González-Vera and Arancibia, who suffered pecuniary losses, as well as the loss of the society, comfort, attention, services and support of their family members, are entitled to recover on their own behalf as a result of the forced disappearance of their loved ones.

165.   Defendant United States', Kissinger's and Townley's negligent, reckless, deliberate, willful, wanton, intentional, malicious, and/or oppressive conduct gives rise to Plaintiffs' demand for punitive damages.

### TENTH CLAIM FOR RELIEF

### (Assault and Battery)

166.   Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 81 as fully set forth herein.

42

167.    Defendants Kissinger and United States knowingly provided practical assistance and encouragement to the Chilean repressive regime with reckless disregard for the lives and well-being of the Plaintiffs and their families. Such assistance and encouragement had a substantial effect on the assault and battery of Soria, Llidó, Enrique Astudillo Álvarez, Ramón Astudillo Rojas, Omar Astudillo Rojas, Hennings, Chanfreau, Berger, Lorca, Zamorano, Muñoz, Valero, Taberna, and Arancibia.

168.    Defendant Townley knowingly provided practical assistance and encouragement to the Chilean repressive regime with reckless disregard for the lives and well-being of the Plaintiffs and their families. Such assistance and encouragement had a substantial effect on the assault and battery of Soria.

169.    Defendant United States', Kissinger's and Townley's acts are actionable under the laws of the United States, the laws of the District of Columbia, the laws of Chile, the international treaties, agreements, conventions and resolutions described in paragraphs 8-10 herein to which the United States is party, and customary international law.

170.    As a result of Defendant United States', Kissinger's, and Townley's actions, Soria, Llidó, Enrique Astudillo Álvarez, Ramón Astudillo Rojas, Omar Astudillo Rojas, Hennings, Chanfreau, Berger, Lorca, Zamorano, Muñoz, Valero, Taberna, and Arancibia were placed in great fear for their lives, and suffered physical and psychological abuse and agony. Defendant United States', Kissinger's and Townley's actions further resulted in the prolonged mental anguish and suffering of Plaintiffs González-Vera, Llidó, Astudillo, Hennings, Berger, Lorca, Marín, Muñoz Marín, Ramírez, Valero, and Arancibia that continues to the present date.

171.    By virtue of Defendant United States', Kissinger's, and Townley's actions and/or omissions, Plaintiff Mitchell, as personal representative of the estates of Soria and Taberna, is

43

entitled to recover compensatory damages on behalf of their estates as provided by law.
Plaintiffs Llidó, Astudillo, Hennings, Berger, Lorca, Marín, and Ramírez are entitled to recover
compensatory damages on behalf of the loved ones they represent. Plaintiffs González-Vera,
Llidó, Astudillo, Hennings, Berger, Lorca, Marín, Muñoz Marín, Ramírez, Valero, and Arancibia
are entitled to recover compensatory damages on their own behalf.

172.    Defendant United States', Kissinger's, and Townley's negligent, reckless, deliberate,
willful, wanton, intentional, malicious, and/or oppressive conduct gives rise to Plaintiffs'
demand for punitive damages.

## ELEVENTH CLAIM FOR RELIEF

### (Intentional Infliction of Emotional Distress)

173.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1
through 81 as fully set forth herein.

174.    Defendants Kissinger and United States knowingly provided practical assistance and
encouragement to the Chilean repressive regime with reckless disregard for the lives and well-
being of the Plaintiffs and their families. Such assistance and encouragement had a substantial
effect on the intentional infliction of emotional distress suffered by Soria, Llidó, Enrique
Astudillo Álvarez, Ramón Astudillo Rojas, Omar Astudillo Rojas, Hennings, Chanfreau, Berger,
Lorca, Zamorano, Muñoz, Valero, Taberna, and Arancibia. As a result, Plaintiffs González-
Vera, Llidó, Astudillo, Hennings, Berger, Lorca, Ramírez, Marín, Muñoz Marín, Valero, and
Arancibia have suffered prolonged anguish that continues to this date.

175.    Defendant Townley provided practical assistance and encouragement to the Chilean
repressive regime with reckless disregard for the lives and well-being of the Plaintiffs and their

families. Such assistance and encouragement had a substantial effect on the intentional infliction of emotional distress suffered by Soria.

176.    Defendant United States', Kissinger's and Townley's acts are actionable under the laws of the United States, the laws of the District of Columbia, the laws of Chile, the international treaties, agreements, conventions and resolutions described in paragraphs 9-10 herein to which the United States is party, and customary international law.

177.    Defendant United States', Kissinger's and Townley's acts and omissions placed all Plaintiffs and victims in great fear for their lives. Although both Plaintiffs and victims endured severe mental suffering that was foreseeable, real, and extreme, Defendants proceeded with reckless disregard of Plaintiffs' and victims' well-being. Furthermore, these actions resulted in the separation of Plaintiffs from their loved ones, thereby causing Plaintiffs severe suffering as well as psychological abuse and agony.

178.    By virtue of Defendant United States', Kissinger's, and Townley's actions and/or omissions, Plaintiff Mitchell, as personal representative of the estates of Soria and Taberna, is entitled to recover compensatory damages on behalf of their estates as provided by law. Plaintiffs Llidó, Astudillo, Hennings, Berger, Lorca, Marín, and Ramírez are entitled to recover compensatory damages on behalf of the loved ones they represent. Plaintiffs González-Vera, Llidó, Astudillo, Hennings, Berger, Lorca, Marín, Muñoz Marín, Ramírez, Valero, and Arancibia are entitled to recover compensatory damages on their own behalf.

179.    Defendant United States', Kissinger's, and Townley's reckless, deliberate, willful, wanton, intentional, malicious, and/or oppressive conduct gives rise to Plaintiffs' demand for punitive damages.

## JURY TRIAL DEMAND

A jury trial consisting of twelve jurors is demanded for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

For declaratory relief.

For compensatory damages according to proof in an amount to be determined at trial but which is in excess of $11,000,000 for the suffering that resulted from the torture; cruel, inhuman or degrading treatment; false imprisonment; arbitrary detention; wrongful death; summary execution; assault and battery; forced disappearance; crimes against humanity; intentional infliction of emotional distress; violence against women, and other violations of the common law of the United States, the statutes and common law of the District of Columbia, the laws of Chile, the international treaties, agreements, conventions, and resolutions described in paragraphs 8-10 herein, and customary international law.

For punitive and exemplary damages according to proof in an amount to be proven at trial but which is at least twice the compensatory damages to punish Defendants' willful and wrongful actions alleged and described herein.

For reasonable attorney's fees and costs of suit, according to proof.

For such other and further relief as the court may deem just and proper.

46

Respectfully submitted,

Michael E. Tigar, Esq.
DC Bar No. 103762
1025 Connecticut Avenue, NW
Suite 1012
Washington, D.C.  20036
(202) 467-8583

Dated: November 13, 2002
Washington, DC